UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DONNA WITKOP, *Personal Representative*
*of the Estate of Martin Witkop, Deceased,*

        Plaintiff,

v.

Case Number 08-10886-BC
Honorable Thomas L. Ludington

UNITED STATES OF AMERICA, *Department*
*of Defense, Unites States Air Force and Michigan*
*Air National Guard*,

        Defendant.
_____ /

## OPINION & ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT WITH PREJUDICE

On March 3, 2008, Plaintiff Donna Witkop ("Plaintiff"), the appointed personal representative of the estate of Martin Witkop (the "decedent"), filed a complaint alleging that Defendant United States of America's ("Defendant") military aircraft negligently caused the decedent's float plant to crash. On November 15, 2006, the decedent's float plane was located floating upside down in Wixom Lake. The decedent's intention that afternoon was to practice water landings and take-offs on Wixom Lake. Plaintiff theorizes that the decedent encountered wake turbulence, or wake vortices, generated by three military jets flying below an altitude of 1,000 feet, causing the decedent's float plane to fatally lose control.

On January 9, 2009, Defendant moved for summary judgment pursuant to Fed. R. Civ. P. 56. The motion advances three primary reasons to support granting summary judgment in Defendant's favor. First, Defendant challenges Plaintiff's assertion that a Federal Aviation Regulation ("FAR") promulgated by the Federal Aviation Administration ("FAA"), 14 C.F.R. § 91.119 ("Minimum Safe Altitudes"), and a provision of the Michigan Aeronautics Code ("MAC"),

Mich. Comp. Laws § 259.80e  provide legal authority for the imposition of a legal duty upon the military pilots.  The FARs and MAC only permit flight above 500 feet and below 1000 feet in areas that are not  "congested".  In Defendant's view, with which the Court agrees, Plaintiff has not established how either provision was intended to protect anyone other than people and property on the ground or that either provision was meant to regulate aircraft traffic.

Second, even if  Plaintiff could establish a legal duty, Defendant asserts that the military aircraft did not breach that duty because the flight path over Wixom Lake was not through a congested area, as a matter of law.  Defendant argues that flying at an altitude below 1,000 feet was clearly permissible based upon the absence of development and that Plaintiff has not established a potential breach of Defendant's duty of care.  Notwithstanding that proposition, Plaintiff offers authority demonstrating that the location where the decedent's float plane was flying could be characterized as a congested area.  For that reason, the Court rejects Defendant's argument with respect to breach of duty.

Defendant's third argument is directed at the causation element of Plaintiff's cause of action. Defendant asserts that the launch and landing times of the military jets establish that they would have left the airspace over Wixom Lake some thirty minutes before the decedent arrived.  Plaintiff contends that sufficient evidence of the proximity of the decedent's float plane with the military jets exists to demonstrate a prima facie case of causation for a jury's consideration.  Plaintiff relies on two witnesses who believe they observed the military jets at 3:15 p.m. and the clock recovered from the decedent's float plane which stopped at 3:17 p.m..  Defendant counters that even if the military aircraft were in close enough proximity for any risk of confrontation, the single witness who observed both the military jets and the float plane, as the encountering aircraft that was both above

and trailing the military jets, the decedent's float plane had the duty to avoid any wake turbulence caused by the military jets or at least the jets' pilots did not have that duty. For those reasons, the Court will **GRANT** Defendant's motion for summary judgment.

I

A

On November 15, 2006, Air National Guardsmen piloted three A-10 Thunderbolt jets on a low-altitude training mission from an airbase in Battle Creek, Michigan. Dkt. # 26-5 at ¶ 3. The military jets flew a triangular course heading north from Battle Creek to Wixom Lake, then turned east towards Steelhead Military Operating Area above Saginaw Bay of Lake Huron, then proceeded southwest to Battle Creek. *Id.* The military jets departed Battle Creek at 2:16 p.m.[1] and returned at 3:35 p.m. *Id.*

Only one of the three jet pilots, Colonel David Augustine, recalled the flight. *Id.* at ¶ 3. Based on the type of mission and past experience, the jets likely maintained an airspeed of 250 to 300 Knots Indicated Airspeed ("KIAS") and an altitude between 500 and 1000 feet while flying from Battle Creek to Wixom Lake. *Id.* at ¶ 4. Based on the departure time, airspeed, and distance to Wixom Lake, Augustine estimates that the jets likely flew over Wixom Lake between 2:38 p.m. and 2:50 p.m. *Id.* at ¶ 8. Between Battle Creek and Steelhead, Augustine did not observe any other aircraft in the jets' vicinity. Dkt. # 26-5 at ¶ 6. The parties agree that weather conditions were unremarkable and visibility was at least seven miles and not restricted by clouds.

On that same afternoon, the decedent piloted a Maule MX-7-180B float plane, or seaplane, from an airport in Midland, Michigan to Wixom Lake, which is northwest of Midland. Apparently,

---

[1] All times are according to Eastern Standard Time zone.

the decedent planned on practicing landings and take-offs on the lake's surface. On that afternoon, the float plane landed upside down on Wixom Lake, drowning the decedent. While his departure time from Midland is unknown, it is apparent that the incident occurred at approximately 3:17 p.m. because the aircraft's clock displayed that time. The accident scene was not discovered until 4:02 p.m. that day.

Three eyewitnesses near Wixom Lake observed either the jets or the float plane. First, Carol Oullette and Raymond Bauers, recalled that they saw the jets at approximately 3:15 p.m.. Dkt. # 28 at 37, 39. Oullette and Bauers were returning to their home situated a few hundred yards from Wixom Lake when the jets flew overhead. *Id.* Bauers confirmed the time by checking his watch. *Id.* at 39. Oullette commented on the altitude of the military jets as follows: "Because when I – when I looked up I – I ducked, and that's a figure of speech. I said to [Bauer], I said, 'My, God,' I says, 'I could see the whites of those guys' eyes.' " *Id.* at 33. Bauer compared the jets' altitude to that of a "crop-duster" airplane. Dkt. # 26-8 at 2. Neither observed a float plane in the area. *Id.* at 6.

Another witness, Thomas Limberg, was hunting in a wooded area approximately three miles south of Wixom Lake. Limberg was the only person to observe the jets and the float plane on that day. He recalled the jets and the float plane passing overhead between 2:30 p.m. and 3:00. p.m. Dkt. # 26-4 at 2. The jets approached from the south and continued in a northerly direction. *Id.* at 3. Approximately five to ten minutes[2] after the jets flew overhead, Limberg observed the float plane

---

[2] Limberg's deposition testimony indicates that his recollection concerning the timing of the two sets of aircraft wavered slightly. For example, when counsel inquired "how certain [he was] that it was about five minutes later," Limberg as follows: "Well, I'm just – you know, it had – the two events took place in very close proximity, but there was a break between them. But it – it was . . . [f]ive minutes – probably five minutes later – at least five minutes later, but certainly not more than ten minutes later." Dkt. # 26-4 at 5.

proceed on approximately the same path as the jets, but "traveling at a much slower speed." *Id.* at 4-5. He explained that the float plane was neither ascending or descending, but "flying level" at a higher altitude than the jets. *Id.* at 4-6.

B

As introduced above, Plaintiff theorizes that wake turbulence emitted from the military jets caused the decedent's plane to lose control. Air flow over an aircraft's wing generates "swirling air masses trailing downstream of the wing tips." Dkt. # 26-11 at 1. A plane that encounters wake turbulence from a forward plane will experience downward pressure on a wing, interfering with balance and control and can lead to "catastrophic" results. *Id.* at 2, 5.

George Green, a consultant retained by Defendant, opined that wake turbulence emitted from the jets was not a factor in the accident. Dkt. # 26-12 at 5. Green concluded that the jets flew over the lake approximately thirty minutes before the float plane approached. *Id.* at 9. In addition, Green offered his opinion that witness accounts placed the jets' flight path at least one-half mile from crash sight and could not have been a possible factor in causing the accident. Finally, Green reasoned that the difference in the jets and float plane's respective velocities and altitudes also made it impossible for wake turbulence from the jets to affect the float plane. Green estimates that the wake turbulence created by the jets would have only existed for sixty to ninety seconds, with the overall severity of the wake turbulence dissipating as time elapsed. *Id.* at 13.

Michael Vivion, Defendant's expert on seaplane operations, opined that "[t]he responsibility to avoid wake turbulence resides with the pilot of the aircraft encountering a wake vortex, and not with the pilot of the aircraft generating that wake vortex." Dkt. # 26-15 at 3. A following aircraft has a "clear[]" duty to avoid wake turbulence. *Id.*

Dale Leopard, retained by Plaintiff to provide expert opinion testimony, disputes many of the conclusions reached by Defendant's expert witnesses.[3] First, Leopard believes that the testimony of Oullette and Bauer impeaches Green's opinion that the float plane did not come in contact with the jets' wake turbulence. Dkt. # 28 at 64. Second, Leopard opines that a "pilot does not breach his duty to see and avoid when he cannot see the aircraft generating wake turbulence." *Id.* at 62. Leopard reasons that a pilot at the decedent's likely altitude would have no reason to expect the jets or wake turbulence at an altitude below 1,000 feet.

The parties also dispute the minimum required altitude over Wixom Lake. Based on thirty dwellings situated in a traditional arrangement on the lake, Plaintiff contends Wixom Lake is properly characterized as a "congested area" under applicable federal and state guidelines, requiring a minimum altitude of 1,000 feet. *See* 14 C.F.R. § 91.119; Mich. Comp. Laws § 259.80. Defendant contends that aeronautical charts indicate the area to be rural and sparsely populated. Moreover, Defendant disputes that the dwellings were occupied at that time of year. Finally, Col. Augustine and Vivion agree that the area is appropriately considered as sparsely populated. Dkt. # 26-5 at ¶ 5; dkt. # 26-15 at 4.

II

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient

---

[3] While Plaintiff's response includes an affidavit of Leopard responding to the reports of Defendant's experts, Plaintiff has not included a report by Leopard that presents his theory of events.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252."[T]he party opposing the summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quotations omitted)).

### III

Plaintiff seeks relief pursuant to the Federal Tort Claims Act ("FTCA"), which "grants a limited waiver of sovereign immunity and allows tort claims against the United States 'in the same manner and to the same extent as a private individual under like circumstances.' " *Chomic v. United*

*States*, 377 F.3d 607, 609 (6th Cir. 2004) (citing 28 U.S.C. § 2674)). Because all acts underlying Plaintiff's complaint occurred within Michigan's boundaries, Michigan substantive law controls. 28 U.S.C. § 1346(b)(1). Plaintiff's complaint proceeds under a negligence theory. Under Michigan law, a prima facie negligence claim consists of duty, breach of duty, causation, and damages. *Brown v. Brown*, 739 N.W.2d 313, 316-17 (Mich. 2007). Defendant attacks Plaintiff's ability to establish duty, breach, and causation.

A

Before addressing whether jets' pilots owed a duty to the decedent pursuant to Mich. Comp. Laws § 259.80e, and 14 C.F.R. § 91.119, it should be acknowledged that Plaintiff has advanced a jury question concerning whether Defendant breached such a duty. It is undisputed that the jets pierced the 1,000 foot threshold over Wixom Lake. While the parties dispute if Wixom Lake is considered a "congested area" requiring an altitude exceeding 1,000 feet, that is a question of fact.

Whether an area is congested is determined on a "case-by-case basis." FAA Legal Interpretation 1979-57, 1979 WL 395494 (D.O.T. Oct. 3, 1979). The FAA Legal Interpretation noted that the following areas have been determined to be congested under the rule: airspace "over a small congested area consisting of approximately 10 houses and a school . . . and over a boy's camp where there were numerous people on the docks and children at play on shore." *Id.* In addition, a "subdivision of at least 40 occupied homes on adjacent one acre lots" constitutes a "settlement" and is not a sparely populated area. *Id.* This authority raises the possibility that a finder of fact could conclude that the Minimum Safe Altitude was 1,000 feet based on the residential dwellings surrounding Wixom Lake.

B

Existence of a duty, however, is a question of law. *Valcaniant v. Detroit Edison Co.*, 679 N.W.2d 689, 691 (Mich. 2004) (quotation, ellipse, and citation omitted). "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Brown*, 739 N.W.2d at 317 (citation omitted). "In determining whether a legal duty exists, courts examine a variety of factors, including foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach." *Valcaniant*, 679 N.W.2d at 691.

In the context of aviation, duty may arise from various sources, including the FARs, codified at 14 C.F.R. § 91.101 *et seq.*, the MAC, codified at Mich. Comp. Laws § 259.1 *et seq.*, the FAA's Aeronautical Information Manual ("AIM"), containing flight and air traffic procedural information, and the FAA's Advisory Circular 90-23D ("AC 90-23D"), concerning wake turbulence and avoidance procedures. *See First Am. Bank-Cent. v. United States*, 639 F.Supp. 446, 453 (W.D. Mich. 1986). Plaintiff argues the FARs and the MAC impute a duty on the military jets to not "operate an aircraft in a careless or reckless manner so as to endanger, or be likely to endanger, the life or property of another." Mich. Comp. Laws § 259.80b(a)(7); *see also* 14 C.F.R. § 91.117(b). Indeed, a pilot is under a common law duty to exercise ordinary care. *See Musick v. United States*, 768 F.Supp. 183, 187 (W.D. Va. 1991). By way of analogy, when a party violates an automobile traffic regulation, a presumption of negligence arises. *See* Mich. Model Civ. J.I. § 12.01. In such a circumstance, however, the plaintiff must demonstrate both that the statute was intended to govern

the specific risk involved and that the plaintiff was a member of the class to be protected by the statute.  The theory advanced by Plaintiff, however, does not implicate that duty.

Defendant emphasizes that duty rests with the trailing pilot to "exercise the same degree of caution to visualize and avoid wake turbulence encounters with other aircraft." *Scruggs v. United States*, 959 F.Supp. 1537, 1545 (S.D. Fla. 1997) (citing 14 C.F.R. § 91.113(b)).  A trailing pilot is responsible for "avoiding wake turbulence . . . because the pilot is in the best position to visualize the location of the vortex trail behind large aircraft and to do whatever is necessary to avoid the hazard."  *Mgmt. Activities, Inc. v. United States*, 21 F. Supp. 2d 1157, 1178 (C.D. Cal. 1998) (quoting *Dyer v. United States*, 832 F.2d 1062, 1070 (9th Cir. 1987) (further citations omitted)).

Indeed, the AC 90-23D instructs an encountering pilot to "[a]void flight below and behind a larger aircraft's path."  Dkt. # 26-13 at 8.  The AIM similarly provides that the encountering "pilot has the ultimate responsibility for ensuring appropriate separations and positioning of the aircraft in the terminal area to avoid the wake turbulence created by a preceding aircraft."  Dkt. # 26-11 at 4.  Moreover, "[p]ilots of all aircraft should visualize the location of the vortex trail behind larger aircraft and use proper vortex avoidance procedures to achieve safe operation."  *Id.* at 5.  Thus, as the encountering pilot, the decedent maintained the duty to avoid wake turbulence.

While largely agreeing with Defendant's assertion that all pilots have a duty to see and avoid aircraft and that trailing aircraft generally have the duty to avoid wake turbulence, Plaintiff argues that Michigan law and FAA regulations also require an aircraft to maintain an altitude of 1,000 feet when flying over a "congested area."  *See* Mich. Comp. Laws § 259.80e; *see also* 14 C.F.R. § 91.119.  Otherwise, an aircraft is only required to maintain an elevation of 500 feet when in airspace over a sparsely populated area.  *Id.*  Although the statutes at issue do restrict flight below 1,000 feet

in "congested areas," Plaintiff has not advanced any authority for the proposition that the statutes or regulations were intended to benefit the decedent or intended to govern flight risks between aircraft. Indeed, the authority is to the contrary. *See Henderson v. Volpe-Vito, Inc.*, No. 2665's 2006 WL 1751832, at *2 (Mich. Ct. App. June 27, 2006) (citing *Klanseck v. Anderson Sales & Service, Inc.*, 393 N.W.2d 356, 360 (Mich. 1986)); *see also* Mich. Model Civ. J.I. § 12.01.

The language of the statute indicates that it was expressly intended to prevent damage to people and property on the surface, as it twice references the operation of aircraft with respect to "persons and property *on the surface*," but does not mention adjacent aircraft. Mich. Comp. Laws § 259.80e (emphasis added). This point is underscored by the authority relied upon by Plaintiff, *Musick v. United States*, 768 F.Supp. 183, 187 (W.D. Va. 1991). In *Musick*, the plaintiff was injured when a low-flying jet severed a branch from a tree, which fell atop the plaintiff. *Id.* The court found the government negligent because it had breached a Virginia statute that prohibited operation of an aircraft "without due caution and circumspection and in a manner so as to endanger any person or property . . . ." *Id.* (citing Va. Code Ann. § 5.1-13). That court reasoned that the plaintiff was a member of the protected class because the statute defined the class as "*any* person or property." *Id.* (emphasis added).

In contrast, Michigan's statute identifies the protected class as persons and property on the surface. Likewise, the federal regulation is intended "to provide minimum safe altitudes for flight and to provide adequate protection *to persons on the ground*." FAA Legal Interpretation 1979-57 1979 WL 395494 (D.O.T. Oct. 3, 1979) (emphasis added). Thus, the statute concerning minimum altitude does not establish a duty with respect to other aircraft and Plaintiff has not identified an applicable duty.

C

Finally, even if Plaintiff identified a controlling duty, Plaintiff has not met the evidentiary burden with respect to causation. Proximate cause is not presumed from the mere occurrence of an accident. *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994). To satisfy the proximate cause element, a plaintiff must demonstrate the breach of duty was the "(1) cause in fact and (2) legal cause." *Id.* (citation omitted). To establish cause in fact, the burden lies with the plaintiff to illustrate that " 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id.* (citation omitted). A plaintiff must establish cause in fact before a court will address legal cause. *Id.* Legal cause focuses on the forseeability of the consequence and whether defendant should be held legally responsible. *Id.*

Plaintiff emphasizes Oullette's observation of the jets over Wixom Lake at 3:15 p.m. and the float plane's clock stopping at 3:17 p.m. Consequently, Plaintiff reasons, the float plane could have encountered wake turbulence from the jets.

Viewing the record as a whole, however, Plaintiff does not offer sufficient evidence to raise this theory beyond the level of speculation. Limberg, the only person to observe both the jets and the float plane, placed the jets at least five minutes ahead of the float plane – ample time for the wake turbulence to dissipate. In addition to the gap in time, Limberg noted, and it remains an uncontested observation, that the decedent's float plane was at a higher elevation and "flying level." Thus, proceeding at a lower altitude, the jets would have generated wake turbulence below the level of the float plane. The wake turbulence would have descended and reduced further with each passing moment. While Plaintiff's expert speculates that the decedent was "surveying the landing area, not making his final approach to land," such a proposition does not explain how the float plane

could have encountered the wake turbulence, or why, as the trailing aircraft, the decedent was relieved of his duty to avoid the wake turbulence. The connection between the military jets' presence and the eventual tragic accident remain unacceptably tenuous to present a legitimate jury question. Moreover, Plaintiff has not proffered any evidence supporting the conclusion that the military jets overtook the decedent's float plane.

IV

Accordingly, Defendant's motion for summary [Dkt. # 26] judgment is **GRANTED**. Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 23, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 23, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---